**NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-24-0000298
06-MAR-2026
10:26 AM
Dkt. 63 SO**

NO. CAAP-24-0000298


IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


LINDSAY N. MCANEELEY, Petitioner-Appellee,
v.
DOREEN FUKUSHIMA, Respondent-Appellant


APPEAL FROM THE DISTRICT COURT OF THE FIRST CIRCUIT
HONOLULU DIVISION
(CASE NO. 1DSS-24-0000308)


<u>**SUMMARY DISPOSITION ORDER**</u>
(By: Nakasone, Chief Judge, Wadsworth and Guidry, JJ.)

Respondent-Appellant Doreen Fukushima (**Fukushima**)

appeals from the "Injunction Against Harassment" (**Injunction**)

entered on March 22, 2024 by the District Court of the First

Circuit[1] (**district court**).

In the underlying case, Petitioner-Appellee Lindsay N.

McAneeley (**McAneeley**) filed a "Petition for Ex Parte Temporary

---

[1] The Honorable Shellie K. Park-Hoapili presided.

Restraining Order [(**TRO**)] and for Injunction Against Harassment" (**Petition**) against Fukushima.  On March 11, 2024, the district court granted McAneeley's Petition for a TRO, prohibiting Fukushima from "contacting, threatening, or physically harassing" McAneeley.  Fukushima was served with the TRO on March 18, 2024.  On March 22, 2024, following a trial on the Petition at which Fukushima was self-represented, the district court issued the Injunction.[2]

Fukushima asserts three points of error on appeal, contending that the district court erred by: (1) "violat[ing] [Fukushima's] constitutional rights to substantive and procedural due process of law" by not "advis[ing] [Fukushima] at the commencement of the case that [Fukushima] had a right to be represented by counsel," and by not "advis[ing] [Fukushima] that if she needed more time to obtain counsel or prepare for the hearing she could make such a request"; (2) "violat[ing] [Fukushima's] constitutional right to freedom of speech when it allowed [McAneeley's] counsel to introduce two exhibits (Exhibits 8 and 9) into evidence even though they were not addressed to [McAneeley] and [Fukushima] stated that her posts were protected by her right to freedom of speech"; and (3) "determin[ing] that [McAneeley] had proved by clear and

_____

[2]    The district court denied McAneeley's request for attorney's fees, as well as Fukushima's request to be compensated for income lost during the time she was in court to defend against the Petition.

convincing evidence that [Fukushima] had committed harassment as defined by [Hawaii Revised Statutes (**HRS**)] §[ ]604-10.5(a)(2) [(2016)]."

Upon careful review of the record, briefs, and relevant legal authorities, and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Fukushima's points of error as follows:

(1) Fukushima contends that the district court violated her due process rights by not advising her "that [she] had a right to be represented by counsel," and that she could request a continuance "if she needed additional time to prepare for the hearing." (Formatting altered.) "We review questions of constitutional law de novo, under the right/wrong standard." Jou v. Dai-Tokyo Royal State Ins. Co., 116 Hawai'i 159, 164-65, 172 P.3d 471, 476-77 (2007) (cleaned up).

The underlying TRO proceeding is civil in nature. See Duarte v. Young, 134 Hawai'i 459, 463, 342 P.3d 878, 882 (App. 2014) ("[T]he purpose of HRS § 604-10.5 was to prevent harassment that cannot be effectively controlled by criminal processes and penalties and to adopt a civil statute that can be used to interrupt systematic and continuous intimidation that stops short of assault or threats." (cleaned up)). Parties to a civil case have no constitutional right to the assistance of counsel, though courts have acknowledged the right of civil

3

litigants to retain and fund counsel of their choice.  See <u>Adir Int'l, LLC v. Starr Indem. & Liab. Co.</u>, 994 F.3d 1032, 1039 (9th Cir. 2021) (recognizing that "courts have generally acknowledged a civil litigant's Fifth Amendment due process right to retain and fund the counsel of their choice." (citation omitted)).

Here, the record reflects that the TRO provided notice to Fukushima that she had the right to retain an attorney to represent her at the hearing:

> Prior to the scheduled hearing date, you or your attorney may file a written response explaining, excusing, justifying, or denying the alleged act or acts of harassment.  At the hearing, the parties shall be prepared to testify, call and examine witnesses, present any documents, and give legal or factual reasons why the Injunction should or should not be granted.  Each party may be represented by an attorney and shall be prepared to proceed at the hearing. **IF YOU OR YOUR ATTORNEY FAIL TO ATTEND AT THE TIME AND PLACE DESIGNATED, AN ORDER GRANTING PETITION FOR INJUNCTION AGAINST HARASSMENT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE PETITION.**

At the hearing on the Petition, the district court asked Fukushima whether she had received a copy of the TRO (she had), and whether she agreed to an injunction (she expressed that she wanted to challenge the Petition).  At that time, the district court raised the option of a continuance, informing the parties that "[it] can either continue -- the TRO's in place until -- it's certified till June."  Fukushima indicated that she wished to proceed with trial that day, and that she was willing to wait until the district court could recall the case for trial later that day.  Following an hour-long recess, during

which the district court addressed other matters to which it had referred, the district court recalled the case, and asked the parties if they were ready for trial. Fukushima replied, "[d]id my best, Your Honor."

In Luat v. Cacho, upon which Fukushima relies, this court clarified that "a TRO, in view of its emergency remedial nature, may be granted *ex parte*," but "a respondent who, either orally or in writing, denies or controverts the material allegations contained in a petition for injunction under HRS § 604-10.5 is statutorily and constitutionally entitled to a prior evidentiary hearing before a three-year injunction order may issue." 92 Hawai'i 330, 346, 991 P.2d 840, 856 (App. 1999). We therefore held that, "[g]iven the serious consequences that may flow from such an injunction order, a respondent must be given a reasonable time to obtain the services of a lawyer, conduct discovery, obtain documentary and testimonial evidence, and prepare a proper defense to the allegations raised in the petition." Id. This court also noted that "[t]he TRO served on [the respondent] also failed to inform [the respondent] that he was entitled to an evidentiary hearing on [the petitioner's] petition if he contested or denied the allegations in the petition." Id. at 345, 991 P.2d at 855.

Luat is distinguishable from the present case. In Luat, the respondent informed the presiding judge that he was

not aware he could introduce witness testimony at the hearing, and that there were witnesses not present at the hearing who would testify on his behalf. Id. at 334-35, 991 P.2d at 844-45. We held that, under those circumstances, "the district court should have *sua sponte* continued the TRO and the hearing in order to allow [the respondent] the opportunity to adduce evidence and witnesses critical to his defense." Id. at 346, 991 P.2d at 856.

Here, the TRO served on Fukushima advised that an evidentiary hearing would be conducted and that Fukushima or her attorney should be "prepared to testify, call and examine witnesses, present any documents, and give legal or factual reasons why the Injunction should or should not be granted." Fukushima appeared at the hearing, did not indicate any need or desire for a continuance, and proceeded to introduce her evidence at trial. Fukushima submitted twenty-four exhibits; the district court admitted all of Fukushima's exhibits except for Exhibit 13, which was stricken. She also testified at trial and cross-examined McAneeley.

On this record, we conclude that Fukushima's due process rights were not violated.

(2) Fukushima contends that the district court's admission of McAneeley's Exhibits 8 and 9 violated her right to free speech. Exhibits 8 and 9 are social media postings by

Fukushima. When asked, Fukushima did not object to the admission of these exhibits at trial. In any event, Fukushima contends on appeal that she "had a constitutionally protected right to express," via social media, her "dissatisfaction with the performance of an attorney who had undertaken to represent her."

Fukushima posted the following message on social media on January 30, 2024, which was introduced as McAneeley's Exhibit 8:

> I celebrated my birthday last week and my crazy staff surprised me with balloons, decorations and cup cakes. I owe them for staying with me through all of the challenges our practice has faced since last year. I tried to reason with a law firm that has done so much wrong to me and they have made it clear that they have no interest in reconciliation. It's a shame because lawyers usually tell you that settlement is the best option but I guess that goes out the window when they're personally involved. I have chosen to fight this battle but **I wish the one attorney whose actions I feel were misguided would have the strength to come forward and admit her wrongdoing. If she did, then I would be willing to accept her apology and move forward because once I start down this road I won't stop which is likely going to result in outcomes that will change the lives of everyone involved.** I have made my peace with that and know I'm justified in doing what I have to do because now my ex law firm has become goliath but I'm still David. This time I won't lose because I never give up without a fight.

(Emphasis added.)

Fukushima posted the following message on social media on February 1, 2024, which was introduced as McAneeley's Exhibit 9:

> I went out with my mother and friend to get some much needed support and advice during this tough time. They both agree that I'm doing the right thing by taking legal action against my ex law firm for how horrendously they've treated me. I am definitely going to keep blasting them on

social media because people should see how they treat their clients and how incompetent they are.  However I have held off because **I'm giving one last chance to the female attorney who started all this to right her wrong by coming to me, taking accountability and apologizing for what she has done.  In case she's got brain damage and doesn't know who she is, her initials are LM.  If she doesn't come by tomorrow (2-2-24), then I will air all of her dirty laundry to the public and pursue a complaint to the Hawaii Bar and the Office of Disciplinary Counsel which will likely result in her disbarment.  If she values being honest and wants any chance to still be a lawyer in the future, she has until tomorrow to own what she has done.  I've given her more than enough chances for redemption, so if she passes this up for the 20th or so time, then maybe she needs to lose her license because she's too foolish to do what's right.**  She should know where i work since she did defend my practice when she was my attorney and i will be there tomorrow all day working until 4 pm when I end and get ready to cheer on the UH Men's volleyball at 7 pm. [sic] At this point I haven't found anyone to come with me so I'll be going solo which doesn't bother me but it would be fun for someone to laugh and have a good time to start off the weekend.

(Emphasis added.)

McAneeley alleged that Fukushima harassed her through an intentional and knowing course of conduct that included unwelcome communications and romantic overtures, unwanted gifts, and uninvited appearances at her home.  Fukushima testified that the messages in McAneeley's Exhibits 8 and 9 referenced and were directed towards McAneeley, and that Fukushima was "trying to get [McAneeley] to see the error of her ways."  When asked if her postings were "an invitation for [McAneeley] to reach out to [her]," Fukushima replied, "[y]es, if she'd like."  On this record, we conclude that Fukushima's social media postings were admitted for the purpose of establishing Fukushima's pattern of harassing conduct towards McAneeley, and not to punish Fukushima

for expressing her opinion regarding McAneeley's legal representation. See Justo v. Kauka, No. CAAP-21-0000423, 2023 WL 6804757, at *5 (Haw. App. Oct. 16, 2023) (SDO) (citing Moysa v. Davies, No. 28753, 2009 WL 1178659, at *2 (Haw. App. May 4, 2009) (SDO)) ("Courts may properly restrict statements made with the intent to harass." (citations omitted)).

We therefore conclude that the district court did not violate Fukushima's free speech rights by permitting the admission of Exhibits 8 and 9 into evidence.

(3) Fukushima contends that the district court erred by finding that McAneeley met her burden of proving by clear and convincing evidence that Fukushima committed harassment pursuant to HRS § 604-10.5(a)(2).[3] "Whether there was substantial evidence to support an injunction against an alleged harasser is

---

[3] HRS § 604-10.5(c) (Supp. 2023) permits "[a]ny person who has been subjected to harassment" to "petition the district court for a temporary restraining order and an injunction from further harassment." The statute defines "[h]arassment" as, in relevant part,

> (2) An intentional or knowing course of conduct directed at an individual that seriously alarms or disturbs consistently or continually bothers the individual and serves no legitimate purpose; provided that such course of conduct would cause a reasonable person to suffer emotional distress.

HRS § 604-10.5(a)(2).

"Course of conduct" is defined as "a pattern of conduct composed of a series of acts over any period of time evidencing a continuity of purpose." HRS § 604-10.5(a) (2016).

reviewed under the clearly erroneous standard." Duarte, 134 Hawai'i at 462, 342 P.3d at 881 (cleaned up).

There is substantial evidence in the record to support the Injunction. McAneeley testified that she and another attorney had represented Fukushima in a litigation matter, and that, during the course of the representation, Fukushima had expressed interest in a romantic relationship with McAneeley. McAneeley told Fukushima "that would not be possible" because McAneeley was not interested in women, and that a romantic relationship would be inappropriate given her role as Fukushima's counsel.

The litigation matter ended. Fukushima sent a gift and thank you note to McAneeley, and McAneeley sent Fukushima an email thanking her and "wishing her well." McAneeley testified that she did not expect further contact with Fukushima.

The record reflects that Fukushima continued to pursue communication with McAneeley by voicemail and email. Fukushima's email message, with the subject line "Strike 2", dated October 15, 2023, invited McAneeley to play "walking soccer" with Fukushima, and said "[i]t's supposed to be light contact but I won't cry too hard if you slap me around a little." Fukushima's email message, with the subject line "Strike 3", dated October 17, 2023, invited McAneeley to travel with her to Disneyland, and communicated to McAneeley that,

"unless you serve me with a restraining order, . . . I'll assume you still are looking for me to send an email with whatever it'll take to get you to hit the reply button on your email." McAneeley did not respond to Fukushima's email messages.

Fukushima twice showed up uninvited and unannounced at McAneeley's home. McAneeley testified that she did not tell Fukushima where she lived, that she did not know how Fukushima found her address, and Fukushima's appearance at her home was "[a]bsolutely unwelcome." During the first encounter, Fukushima was accompanied by three other individuals, and McAneeley testified that she found the experience "absolutely terrifying." Fukushima testified that McAneeley "look[ed] petrified."

Following Fukushima's first uninvited visit, McAneeley's law firm sent an email message to Fukushima, requesting that Fukushima cease all contact and communication with McAneeley:

> We've . . . been made aware of some communications you've sent to [McAneeley] over the past couple of months that have made her uncomfortable. We understand that over the weekend, you showed up at [McAneeley's] home uninvited. These contacts were not welcomed by [McAneeley]. As a result of these actions, **we are writing to request that you cease communicating with [McAneeley] and that you not attempt to come to the firm's offices. . . . The firm will not be taking on any new engagements for you**[.]

(Emphasis added.)

Notwithstanding the clear request that Fukushima cease contact and communications with McAneeley, Fukushima went to McAneeley's home a second time. McAneeley testified that,

during that encounter, um -- [Fukushima] said she had brought bail money because she knew that it was -- I may call the police on her and that she may have to go to jail for coming, that people had told her not to come, but that she wanted -- she felt that she needed to come because I was her twin flame, that a psychic had told her, that I was her twin flame, and that, uh -- we share one soul.

Fukushima acknowledged that she went to McAneeley's home for the second time after receiving the "banning email." Fukushima described the second encounter as follows,

> And I said, you know what? I will take a gamble. **I told my mother, I said, I'm gonna go one more time. And, you know, I might get a restraining order on me.** And jokingly I said I had bail money on me.
>
> And **when I got there, [McAneeley] panicked again**, and I said, look, [McAneeley]. I said, give me a minute. **I said, you know, I take a risk that by coming here today you could call the police and have a restraining order on me.** And I -- I guess I was right.
>
> So I do own that I went there. And I went there with a job offer for [McAneeley]. The job offer I came in November to offer her, which was for her to start her own firm and I would help her. Because I said, I don't feel like you're respected in your law firm. I would never bark or yell at you. I think you're a very good attorney. And I actually jokingly said, hey, why don't you sue your law firm with me? Wrongful termination, uh -- hostile work environment. Because once upon a time I was a worker's comp, uh -- evaluator.
>
> And, you know, **just seeing [McAneeley] panic, and when I offered her the job, her response is -- three times is I am not gay.**
>
> And I'm like, that's not a job qualification is to be gay.
>
> But **[McAneeley] kept saying that.** Which means to me, she is probably suppressing whatever her feelings are.

(Emphasis added.)

Fukushima also, in an attempt to communicate with McAneeley, posted the social media messages at issue in section (2), supra. At around the same time, McAneeley received a

delivery of roses, a stuffed teddy bear, candy, and a balloon, accompanied by a note.  Although the note was unsigned, McAneeley testified that she knew it was from Fukushima because it asked McAneeley to "bring[] those 51 fingers and toes to where they're supposed to be," referencing a phrase that Fukushima had said to McAneeley in prior communications.

The substantial record evidence supports that Fukushima engaged in "[a]n intentional or knowing course of conduct directed at [McAneeley] that seriously alarm[ed] or disturb[ed] consistently or continually bother[ed] [McAneeley]" and that "such course of conduct would cause a reasonable person to suffer emotional distress."  See HRS § 604-10.5(a)(2).  We therefore conclude that the district court's Injunction was not clearly erroneous.

For the foregoing reasons, we affirm the Injunction.

DATED: Honolulu, Hawaiʻi, March 6, 2026.

| On the briefs: | /s/ Karen T. Nakasone |
| | Chief Judge |
| Francis T. O'Brien, | |
| for Respondent-Appellant. | /s/ Clyde J. Wadsworth |
| | Associate Judge |
| Kirk M. Neste, | |
| for Petitioner-Appellee. | /s/ Kimberly T. Guidry |
| | Associate Judge |